IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **KEITH KIRGAN, # N97672,** ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| vs. ) | Case No. 19-cv-779-NJR |
| ) | |
| **GREG MORGENTHALER,** ) | |
| ) | |
| Respondent. ) | |

# MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

In 2013, Petitioner Keith Kirgan was convicted of one count of felony criminal sexual assault and one count of felony criminal sexual abuse after a bench trial in Marion County, Illinois. He was sentenced to thirty years imprisonment on the sexual assault charge.[1] He is now in custody of the Illinois Department of Corrections at Big Muddy River Correctional Center.

Through counsel, Kirgan filed this action seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (Doc. 1) on the following grounds:

1. Kirgan was not informed of the nature and cause of the charge against him and was unable to prepare a defense because the charging instrument charged him with "placing [his] penis in W.P.'s anus" but the prosecution asserted in closing argument that all that was required was that his penis contacted W.P.'s anus.

2. Kirgan's right to counsel of his choosing was violated when his first attorney was allowed to withdraw before trial.

3. Kirgan's due process rights were violated when the state court dismissed his postconviction petition without an evidentiary hearing.

Respondent filed a Response at Doc. 9 arguing that the first two claims are procedurally defaulted and the third claim is not cognizable. Relevant portions of the state court record are

---

[1] No sentence was imposed on the sexual abuse charge because it merged with the assault charge.

1

attached to Docs. 10 and 14. Kirgan filed a Reply at Doc. 12.

### RELEVANT FACTS AND PROCEDURAL HISTORY

**1.      State Trial Proceedings**

This summary of the facts is derived from the detailed description by the Illinois Appellate Court, Fifth District, in its Rule 23 Orders affirming Kirgan's conviction on direct appeal and affirming the dismissal of his postconviction petition. *People v. Kirgan*, No. 5-13-01845 (June 11, 2014); *People v. Kirgan*, No. 5-16-0538 (Sep. 20, 2018). (Docs. 10-1 and 10-5).[2] The state court's factual findings are presumed to be correct unless rebutted by clear and convincing evidence, which Kirgan has not done. 28 U.S.C. § 2254(e).

The seventeen-year old victim, W.P., went to Kirgan's house with her friends Nikki Bray and Steven Kirgan. Steven Kirgan is Keith Kirgan's son.[3] By the time of trial, Nikki and Steven were married to each other. Keith Kirgan offered W.P. a Xanax pill; she took half. Nikki also took a Xanax pill given to her by Keith Kirgan. Both young women told the police that drinks given to them by Keith Kirgan tasted strange and they had dumped out the remainder of the drinks.

Out of the hearing of W.P. and Nikki, Keith Kirgan told Steven that he had put something in the drinks he had given to the two young women, and that he planned to have sex with W.P. when she passed out. Steven and Keith Kirgan argued, and Keith Kirgan apologized.

W.P. and Nikki laid down on the living room floor to watch a movie. Both passed out. W.P. woke up and found that her pants and underwear were pulled down and Keith Kirgan was lying next to her, naked, with his arm around her shoulder. Steven came into the room at this point and saw his naked father laying next to W.P. Steven "freaked out," got W.P. out to his car, and

---

[2] Citations in this Order are to the document and page numbers assigned by the Case Management/Electronic Case Filing ("CM/ECF") system.
[3] Steven Kirgan was about twenty-three years old at the time of the crime. He was twenty-seven at the time of trial. (Doc. 10-11, p. 314).

came back into the house to get Nikki. Nikki heard Keith Kirgan say that there had been a misunderstanding and that all he and W.P. had done was "make out."

Steven drove to his mother's house. The mother testified that Steven was crying, upset, and "bewildered." He told her that his father had done something that Steven "couldn't believe" and that he had drugged the victim. Steven's mother took the three to the hospital where W.P. reported that she was possibly sexually assaulted. A doctor collected samples using a sexual assault kit. Semen matching Keith Kirgan's DNA profile was found on W.P.'s underwear, her leg or thigh area, and on two anal swabs.

At trial, Steven and Nikki testified that they did not remember making statements to the police consistent with the above facts, but they did not deny making the statements. Steven made three statements to the police. The statements made by Steven and Nikki were admitted into evidence. At the end of the bench trial, the trial judge said that he found Steven and Nikki's inability to recall making their statements to the police to be "convenient" and he had no doubt that what they had told the police and Steven's mother was exactly what had happened.

Other facts will be discussed as necessary in the analysis below.

**2.    Direct Appeal**

Kirgan raised the following points on appeal:

1. The charging instrument charged him with placing his penis in the victim's anus, but the prosecution asserted in closing argument that it only had to prove he contacted the victim's anus with his penis.

2. The evidence did not prove him guilty beyond a reasonable doubt.

3. The trial court abused its discretion by allowing his first attorney to withdraw two years before trial.

(Doc. 10-2).

Kirgan did not file a Petition for Leave to Appeal (PLA) to the Illinois Supreme Court.

(Doc. 1, p. 3).

### 3.     Postconviction Petition

Kirgan's amended postconviction petition, filed by counsel, raised the following arguments:

1. He received ineffective assistance from trial and appellate counsel.

2. Steven Kirgan recanted his trial testimony and would now "tell the truth," demonstrating Keith Kirgan's innocence.

(Doc 14-2).

Steven Kirgan's affidavit was attached to the amended petition. In it, Steven states that his trial testimony that he could not remember anything from that night was not true. He had been drinking earlier in the evening and was "highly intoxicated," but he was able to remember "details of the events that happened later in the night, as the effects of the alcohol wore off." Steven's affidavit explains his statements to the police by saying that he felt pressured and afraid that if he did not say what the police wanted to hear, he himself would be charged with some crime. He says that he was told that his story "had better match the girls' stories." Steven remembered being at his father's house that night but did "not remember Keith Kirgan saying he had drugged [W.P.] and Nikki Bray, and that he intended to have sex with [W.P.]." He also stated that it "appeared to [him] that the contact between [W.P.] and Kirgan was consensual because she did not ask to go to the police or hospital until much later after speaking with [Steven's] mother." (Doc. 14-2, pp. 19-23).

The trial court dismissed the petition at the first stage. On appeal, Kirgan argued that he should have been granted an evidentiary hearing because he made a substantial showing that counsel was ineffective, and because the affidavit of Steven Kirgan was newly discovered evidence of actual innocence. The Appellate Court affirmed. (Docs. 10-5, 10-6).

4

Kirgan filed a PLA arguing that he was entitled to an evidentiary hearing on his postconviction petition because Steven Kirgan's affidavit supported a claim of actual innocence. The Illinois Supreme Court denied the PLA. (Docs. 10-9, 10-10).

### LAW APPLICABLE TO SECTION 2254 PETITION

**1.     Substantive Law**

This habeas petition is subject to the provisions of the Antiterrorism and Effective Death Penalty Act (AEDPA). "The Antiterrorism and Effective Death Penalty Act of 1996 modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002).

Habeas is *not* merely another round of appellate review. Under 28 U.S.C. § 2254(d), habeas relief is restricted to cases where the state court determination "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States" or "a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

A judgment is "contrary to" Supreme Court precedent if the state court "contradicts the governing law set forth in [Supreme Court] cases." *Coleman v. Hardy*, 690 F.3d 811, 814 (7th Cir. 2012) (citing *Williams v. Taylor*, 529 U.S. 362, 405 (2000)). A state court decision is an "unreasonable application of" clearly established federal law if the state court "identifies the correct governing legal rule from [Supreme Court] cases but unreasonably applies it to the facts of the particular state prisoner's case." *Coleman*, 690 F.3d at 814 (quoting *Williams*, 529 U.S. at 407).

Federal habeas review serves as "a guard against extreme malfunctions in the state criminal

5

justice systems, not a substitute for ordinary error correction through appeal." *Harrington v. Richter*, 562 U.S. 86, 102-03 (2011) (quoting *Jackson v. Virginia*, 443 U.S. 307, 332, n.5 (1979) (Stevens, J., concurring)). The Supreme Court has repeatedly emphasized that the Section 2254(d) standard "is intentionally 'difficult to meet.'" *Woods v. Donald*, 575 U.S. 312, 316 (2015) (quoting *White v. Woodall*, 572 U.S. 415, 419 (2014), and *Metrish v. Lancaster*, 569 U.S. 351, 358 (2013)).

**2.      Timeliness, Exhaustion, and Procedural Default**

In addition to the requirement for timely filing under the AEDPA, a habeas petitioner must clear two procedural hurdles before the Court may reach the merits of his habeas corpus petition: exhaustion of remedies and procedural default. *Bolton v. Akpore*, 730 F.3d 685, 694-696 (7th Cir. 2013). Before seeking habeas relief, a petitioner is required to bring his claim(s) through "one complete round of the State's established appellate review process" because "the exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999); *see also* 28 U.S.C. § 2254(c). Under the Illinois two-tiered appeals process, habeas petitioners must fully present their claims not only to an intermediate appellate court, but also to the Illinois Supreme Court, which offers discretionary review in cases such as this one. *Id*. Failure to do so results in procedural default.

### ANALYSIS

**Claims 1 and 2 – Procedural Default**

The first two claims are procedurally defaulted because they were not raised for one full round of state court review. They were raised on direct appeal, but Kirgan did not file a PLA seeking Illinois Supreme Court review. Kirgan concedes that these claims are procedurally defaulted but argues that his default should be excused.

Citing cases that predate the enactment of AEDPA, Kirgan first argues that he was not required to present his claims for a full round of state court review because he had no chance of success on the merits in state court. (Doc. 12, p.2). Not surprisingly, he cites no cases decided under the AEDPA excusing procedural default because the petitioner was not likely to succeed on the merits in state court. Further, he misunderstands the doctrine of futility as applied in the Seventh Circuit pre-AEDPA. In a case applying pre-AEDPA law, the Seventh Circuit specified that "the pertinent question is not whether the state court would be inclined to rule in the petitioner's favor, but whether there is any available state procedure for determining the merits of petitioner's claim." *Spreitzer v. Schomig*, 219 F.3d 639, 647 (7th Cir. 2000) (internal citation omitted). If the doctrine of futility retains viability under current law, it is of no help to Kirgan because there was an available state procedure, a PLA. Kirgan's failure to file a PLA means that he has procedurally defaulted his first two claims. *O'Sullivan*, 526 U.S. at 845.

Kirgan's defaulted arguments cannot be considered here unless he demonstrates cause for his default and prejudice, or that failure to consider his arguments will result in a miscarriage of justice because he is actually innocent. *Perruquet v. Briley*, 390 F.3d 505, 514-515 (7th Cir. 2004). He has not attempted to show cause and prejudice, but he does argue miscarriage of justice.

A "credible showing of actual innocence" may serve to excuse procedural default and permit a federal habeas court to review a defaulted constitutional claim. *McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013). *McQuiggin* reaffirmed the *Schlup* standard for a credible showing of actual innocence, cautioning that "tenable actual-innocence gateway pleas are rare" and describing the *Schlup* standard as "demanding" and "seldom met." *McQuiggin*, 569 U.S. at 386.

A credible claim of actual innocence "requires petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence,

trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995). "To demonstrate innocence so convincingly that no reasonable jury could convict, a prisoner must have documentary, biological (DNA), or other powerful evidence; perhaps some non-relative who placed him out of the city, with credit card slips, photographs, and phone logs to back up the claim." *Hayes v. Battaglia*, 403 F.3d 935, 938 (7th Cir. 2005).

The *Schlup* standard permits habeas review of defaulted claims only in the "extraordinary case" where the petitioner has demonstrated that "more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt—or, to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt." *House v. Bell*, 547 U.S. 518, 538 (2006).

Kirgan argues that Steven Kirgan's affidavit constitutes new evidence that establishes his actual innocence. This Court disagrees.

First, as Kirgan himself recognizes, courts view recantation affidavits skeptically:

> Disbelief of recantations is sensible—and not just because the formality of a court, the presence of the litigants, and the gaze of a judge induce witnesses to hew more closely to the truth than they do when speaking in private and attempting to appease the losing side's advocate. Disbelief is reasonable because it protects witnesses after trial, and thus promotes truthful testimony during trial.

*Mendiola v. Schomig*, 224 F.3d 589, 593 (7th Cir. 2000).

In evaluating a claim of actual innocence advanced to overcome procedural default, the federal habeas court must assess all of the evidence, old and new, and "make a probabilistic determination about what reasonable, properly instructed jurors would do." *Jones v. Calloway*, 842 F.3d 454, 461 (7th Cir. 2016), quoting *Schlup*, 513 U.S. at 329. A claim of actual innocence is strong enough to overcome procedural default only where the petitioner convinces the court that

8

it is "more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Ibid*.

Kirgan's claim of actual innocence does not come close. To begin with, in large part, the affidavit is not new evidence at all. Kirgan mischaracterizes the contents of the affidavit, saying that "Steven recanted the portion of his trial testimony in which he said that his father, the Petitioner, told him that he had drugged W.P. and that he intended to have sex with W.P." (Doc. 12, p. 6). However, the affidavit does not deny that Keith Kirgan made that statement. Rather, Steven said in the affidavit only that he did not remember his father making that statement. (Doc. 14-2, p. 19). This aspect of the affidavit is not new evidence. At trial, Steven testified that he did not remember his father telling him "he spiked the girls' drinks." (Doc. 10-11, p. 322).

Kirgan argues that Steven's recantation affidavit is "crucial" because his statement was the only evidence of Kirgan's "intent and state of mind." (Doc. 12, p. 6). Yet the State was not required to present direct evidence of Kirgan's intent and state of mind. Further, Keith Kirgan was not charged with giving the victim a substance to cause her to lose consciousness; he was charged with committing an act of sexual penetration/sexual conduct "knowing that W.P. was unable to give knowing consent." (Doc. 10-11, p. 20).

This Court has considered all of the evidence, along with the affidavit. The victim testified that Kirgan offered her a Xanax pill and she took half; that her lemonade, which had been sitting on table while she took a shower, tasted bad; that Steven told her to be careful because his father put something in her drink; that she passed out on the living room floor; and that she woke up with her pants and underwear pulled down and a naked Keith Kirgan laying next to her. (Doc. 10-11, pp. 297-302). The victim's testimony was consistent with the statements given by Steven and Nikki to the police. Steven and Nikki testified that they could not remember the events of the

9

evening, but they did not dispute that they made the statements. (Doc. 10-11, pp. 321-329, 352-356). A police officer testified that he interviewed Steven at the hospital that night, and Steven told him that his father stated that he put something in the girls' drinks and he intended to have sex with W.P. Steven also told the officer that, when he later went into the living room, he saw his naked father on the floor next to W.P. and W.P.'s pants were down by her knees. (Doc. 10-11, pp. 379-382). A second officer testified that he interviewed Steven at the police station later that night and Steven gave substantially the same statement. (Doc. 10-11, pp. 392-399). Steven's mother testified that Steven came to her house that night with W.P. and Nikki, that Steven was crying and upset, and he said "I didn't think that [Keith Kirgan] would drug us all and then do the stuff to [W.P.]." Steven's mother took them to the hospital. (Doc. 10-11, pp. 425-428). A forensic scientist testified that testing showed the presence of Xanax and cannabis in urine collected from W.P. (Doc. 10-11, p. 401-403). A second forensic scientist testified that samples taken from the victim that night, including anal swabs, matched the DNA profile of Keith Kirgan. (Doc. 10-11, pp. 417-419).

The Court is not persuaded that Steven's affidavit added to the above evidence would make it more likely than not that no reasonable juror would have convicted him. Steven testified at trial that he could not remember the events described in his prior statements, but he did not dispute the accuracy of those statements. The trial judge, who was the finder of fact, drew the obvious conclusion, that Steven did not want to testify against his father but also did not want to testify falsely. A reasonable juror would most likely reach the same conclusion after considering the statements made in the affidavit along with the above evidence.

Granted, Steven's affidavit says that, had he not been "threatened" by the police and the State's Attorney, he would have told what he remembered, which is "different than what was in

the police statements." (Doc. 14-2, p. 21). He does not specify, however, what he remembers now that is different. This is a far cry from the kind of "new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence" that is required. *Schlup*, 513 U.S. at 324.

*Arnold v. Dittmann*, 901 F.3d 830 (7th Cir. 2018), not cited by either party, is instructive because it involves a claim of actual innocence based on a recantation affidavit. There, the petitioner had been convicted of sexually abusing his son, M.A. His new evidence was his son's affidavit recanting his testimony. The case was a "credibility contest" between the petitioner and the son because no one else had personal knowledge of what had happened, and there was no forensic evidence. *Arnold*, 901 F.3d at 832-833. In the affidavit, the son stated that the charges against his father were false and "We did not have any kind of sexual contact." He went on to explain why had made up the allegations against his father. *Arnold*, 901 F.3d at 834. The Seventh Circuit held that this new evidence was plausible enough to entitle the petitioner to a hearing to examine the credibility of the recanting witness. The Court observed, "Given that the State's case against Arnold rested primarily, if not exclusively, on M.A.'s testimony, his recantation as the accusing witness necessarily presents the possibility that Arnold could be factually innocent of assaulting his son." *Arnold*, 901 F.3d 838. The Court also noted, "M.A.'s recantation, if it represents the truth, would by itself exonerate Arnold as a factual matter." *Arnold*, 901 F.3d 830, 839 (7th Cir. 2018). In a footnote, the Court distinguished other cases involving recantations:

> Because Arnold's conviction rests substantively on M.A.'s testimony, this case may be contrasted with others in which the newly proffered evidence of innocence did not by itself exonerate the petitioner or there was additional evidence of the petitioner's guilt apart from the testimony supplied by a recanting witness.

*Arnold*, 901 F.3d at 840, n. 7.

Here, of course, Steven's affidavit does not exonerate Kirgan, let alone exonerate him by

11

itself, and there is additional evidence of Kirgan's guilt apart from Steven's testimony and police statements.

**Claim 3 – Noncognizable State Law Claim**

Kirgan's third claim is that his due process rights were violated by the state court's dismissal of his postconviction petition without an evidentiary hearing. He argues that, as a matter of state law, he was entitled to a hearing. (Doc. 1-1, pp. 28-33).[4]

Kirgan concedes in his reply that habeas relief cannot be granted for an error of state law. (Doc. 12, p. 8). He contends that the state court's denial of a hearing is not an error of state law, but rather an infringement "upon the fundamental fairness that is required in the process." (Doc. 12, p. 8). That argument fails because the State is not required to provide a procedure for a collateral attack on a criminal conviction, and, when it does, due process rights do not attach. *Pennsylvania v. Finley*, 481 U.S. 551, 557 (1987). It follows that an error in state collateral review proceedings is not a cognizable federal habeas claim. *Resendez v. Smith*, 692 F.3d 623, 628 (7th Cir. 2012).

### CERTIFICATE OF APPEALABILITY

Pursuant to Rule 11 of the Rules Governing Section 2254 Cases, this Court must "issue or deny a certificate of appealability when it enters a final order adverse to the applicant." A certificate should be issued only where the petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2).

In order for a certificate of appealability to issue, a petitioner must show that "reasonable jurists" would find this Court's "assessment of the constitutional claims debatable or wrong." *See*

---

[4] In the memorandum in support filed with the Petition, Kirgan references allegations of ineffective assistance of counsel that were raised in his postconviction petition. *See* Doc. 1-1. p. 29. Those ineffective assistance claims were not raised in his PLA (Doc. 10-10) and are therefore procedurally defaulted.

12

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *Buck v. Davis*, 137 S. Ct. 759, 773 (2017). Where a petition is dismissed on procedural grounds without reaching the underlying constitutional issue, the petitioner must show both that reasonable jurists would "find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484.

Here, no reasonable jurist would find it debatable whether this Court's rulings on procedural default or on the substantive issues were correct. Accordingly, the Court denies a certificate of appealability. Petitioner may reapply for a certificate of appealability to the United States Court of Appeals, Seventh Circuit. *See* FED. R. APP. P. 22(b); 28 U.S.C. § 2253(c)(1).

## CONCLUSION

For the reasons set forth above, Keith Kirgan's Petition for Habeas Relief Pursuant to 28 U.S.C. § 2254 (Doc. 1) is **DENIED**, and this entire action is **DISMISSED with prejudice**. The Clerk of Court shall enter judgment accordingly.

If Kirgan wishes to appeal the dismissal of this action, his notice of appeal must be filed with this Court within 30 days of the entry of judgment. FED. R. APP. P. 4(a)(1)(A). A motion for leave to appeal *in forma pauperis* ("IFP") must set forth the issues he plans to present on appeal. *See* FED. R. APP. P. 24(a)(1)(C). If Kirgan does choose to appeal and is allowed to proceed IFP, he will be liable for a portion of the $505.00 appellate filing fee (the amount to be determined based on his prison trust fund account records for the past six months) irrespective of the outcome of the appeal. *See* FED. R. APP. P. 3(e); 28 U.S.C. § 1915(e)(2); *Ammons v. Gerlinger*, 547 F.3d 724, 725-26 (7th Cir. 2008); *Sloan v. Lesza*, 181 F.3d 857, 858-59 (7th Cir. 1999); *Lucien v. Jockisch*, 133 F.3d 464, 467 (7th Cir. 1998). A proper and timely motion filed pursuant to Federal Rule of Civil Procedure 59(e) may toll the 30-day appeal deadline. FED. R. APP. P. 4(a)(4). A Rule 59(e) motion

must be filed no more than twenty-eight (28) days after the entry of the judgment, and this 28-day deadline cannot be extended. Other motions, including a Rule 60 motion for relief from a final judgment, do not toll the deadline for an appeal.

**IT IS SO ORDERED.**

DATED: August 31, 2020

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**